IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CR-381 |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW J. KING, | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its attorneys, Carole S.

Rendon, United States Attorney, and Margaret A. Sweeney and Michelle M. Baeppler, Assistant

United States Attorneys, and hereby files this Sentencing Memorandum.

**I.      Factual and Procedural Background**

In February 2014, the Defendant, Matthew J. King, was a licensed, practicing attorney in

Cleveland, Ohio.  King practiced criminal defense work, representing defendants in state and

federal court.  At the same time, Marcus Terry was a source cooperating with the Northern Ohio

Law Enforcement Task Force (NOLETF).  As part of his cooperation with law enforcement,

Terry held himself out in the community as a drug dealer, and when Matthew King met Terry, he

believed that Terry was a drug dealer.

During their social conversations, King and Terry began discussing a plan to launder Terry's drug proceeds.  Terry notified investigators that he had these conversations with Attorney Matthew King, and consequently, investigators wired Terry with recording equipment and instructed him to meet with King to discuss how King could launder drug money.  What flowed from this meeting was an elaborate money laundering arrangement between King and Marcus Terry; although King's scheme did not go entirely as he planned, King nevertheless took $20,000 of Terry's purported drug money and gave it back to him in small increments, just as he told Terry he would.

The first recorded meeting between Matthew King and Marcus Terry was on February 4, 2014, and during this meeting, King explained to Terry how he was going to launder his money. King explained how he would set up fake businesses for Terry and that they could funnel the drug money through the businesses' accounts.  He explained that this was the best way to avoid "federal bells and whistles."  As a licensed attorney, King knew that this agreement was illegal; he understood the implications of laundering drug money.  So he warned Terry that he "didn't want to know much in the way of details," and that he wanted to have "plausible deniability." Nevertheless, King's knowledge of the law and his awareness of his criminal conduct did not stop him from moving forward with Terry in this money laundering scheme.  Instead, King assured Terry that he was committed to partnering with him in this endeavor, telling Terry, "The better you do, the better I do.  The more business you do, the more business I get, so obviously I look at it more like a long term relationship."

Two days later, on February 6, 2014, King met Marcus Terry at his office again, and he and Terry began to fill out paperwork to create the fake businesses where they planned on funneling Terry's drug money.  During this meeting, King reassured Terry that he could be

trusted, telling Terry that his law office was the one place that law enforcement could not bug. Indeed, it is clear that King believed that he was safe and free to speak openly because when Marcus Terry told King that he had two kilograms of cocaine that he'd be selling in the next week and would have $30,000 to bring to King, King began to brainstorm where he was going to put all that money.  King explained that he would put it into his IOLTA account and then write checks to Terry in small amounts—all in order to make the money look clean.  Excited at the prospect of this criminal business relationship moving forward, King told Terry at the end of this meeting, "I think you and I are going to have a long and prosperous relationship together . . . or we'll be in a shit-load of trouble together."

Only a few days later, on February 10, 2014, Marcus Terry brought $20,000 of what Matthew King believed was cocaine proceeds to King's office.  Terry sat down, took out a Crown Royal bag, and began putting the money, which was banded together in $1,000 increments, on King's desk.  King eagerly began counting the money and then continued to explain how he would launder the money, reassuring Terry about the details.  At no point during this meeting, where Marcus Terry handed the Defendant $20,000 of purported drug proceeds, did King ever hesitate or show any unwillingness to move forward with the money laundering plan that he had outlined.  The only pause in King's mind was at the possibility that he—the licensed, practicing attorney—would be caught, worrying, "God, if you're wearing a wire, I'm fucked."

Less than a week later, King and Terry met again in King's law office.  During this meeting, King wrote a $2,000 check to Terry.  As King wrote the check, King asked Terry what name he should put on the check—Terry or the fake corporation that King was in the process of establishing.  Terry asked King to write the check out to the corporation.  King complied and wrote the check out to M.A.T. Associates, and when King gave the check to Terry, King told

3

him, "Don't cash it until tomorrow.  I'm going to make sure everything is square in there (King's bank account)."  King wanted to make sure that there was enough money in his bank account to cover the $2,000 check; King wanted to make sure that Marcus Terry got his clean money.

Marcus Terry, however, was not able to cash that $2,000 check because the corporation had not yet been formed, so King and Terry met again on March 4, 2014, and King wrote Terry another $2,000 check.  This time, the check was written out to Marcus Terry.  Again, King told Terry to wait until the next day to cash the check because, as King explained, he deposited Terry's money into King's account, that he "co-mingled the funds," and he wanted to make sure that the deposit went through.  Indeed, King's bank accounts corroborate his statement.  On March 3, 2014, King made two $1,000 deposits into his bank account.  These deposits covered the amount of the check that he wrote Marcus Terry the next day.

King's efforts to assist Marcus Terry with his purported drug trafficking activities did not stop at laundering drug money.  During these recorded meetings with Marcus Terry, King used his experience as a criminal defense attorney to advise Terry about how Terry could best run his drug trafficking organization.  King told Terry that he needed to get stash houses to store his drugs.  King also told Terry that he should look for GPS trackers that law enforcement may have installed on Terry's car, and then King went on to explain to Terry what the trackers look like and where law enforcement typically installs them.  King's assistance to Terry went beyond mere advice; King also offered to help Terry identify persons in his purported DTO that may be cooperating with law enforcement by checking their names on court dockets.  King even went on to warn Terry not to work with Gilbert Mendez—one of Defendant's clients—because he knew that law enforcement was investigating Gilbert Mendez.

Matthew King's involvement with Terry ended on April 2, 2014, when King was arrested.  That same day, however, King told Terry that he was prepared to launder another $40,000 of his money.  Indeed, King assured Terry, "I promise I will have you no matter what."

## II.    Law and Argument

The United States agrees with the Guideline calculation set forth in the Presentence Investigation Report (PSR).  (R. 55: PSR First Disclosure, PageID 990-1006).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  Appellate courts must review a district court's sentence for procedural and substantive reasonableness.  *Id.* at 51.  Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range.  *Id.*  The United States has not received any objections to the PSR from Defendant.

### A.    Advisory Guidelines Calculation

As set forth in the PSR, the United States submits that the following is the correct Guideline calculation applicable to King:

| Money Laundering, 18 U.S.C. § 1956(a)(3)(B) | | |
|---|---|---|
| Base Offense Level | 8 +4 | § 2S1.1(a)(2) |
| Specific Offense Characteristic: Drug Proceeds | +6 | § 2S1.1(b)(1) |
| Specific Offense Characteristic: § 1956 Conviction | +2 | § 2S1.1(b)(2)(B) |
| Role: Abuse of Position of Trust | +2 | § 3B1.3 |
| **Total Offense Level before Acceptance of Responsibility** | **22** | |

The government agrees with the PSR's assessment that King's criminal history score places him in a Criminal History Category I.  The resulting advisory Guideline range for King is, therefore, 41-51 months of imprisonment.

Pursuant to U.S.S.G. §2S1.1, King's base offense level begins at 8 and then increases based on the value of the laundered funds. U.S.S.G. § 2S1.1(a)(2).  "'Laundered funds' means

5

the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission involved in violation of 18 U.S.C. § 1956[.]" *Id.* at n.1.  Based on this number, 4 levels are added to King's base offense level, resulting in a total base offense level of 12.

Additionally, a 6-level enhancement applies pursuant to §2S1.1(b)(1) because King believed that the laundered funds were the proceeds of or intended to promote "an offense involving the manufacture, importation, or distribution of a controlled substance," specifically, the distribution of cocaine.  U.S.S.G. § 2S1.1(b)(1)(A)(B)(i).  Another 2-level enhancement applies because King was convicted under 18 U.S.C. § 1956.  U.S.S.G. §2S1.1(b)(2)(B).

The government also agrees with the assessment that King used a special skill that significantly facilitated his commission of the offense and is therefore subject to a two-level enhancement.  U.S.S.G. § 3B1.3.  As the Guidelines note, a special skill "refers to a skill not possessed by members of the general public and usually require[s] substantial education, training or licensing."  § 3B1.3 n.4.  The Guidelines specifically identify a lawyer as an example of a person with a special skill.

Accordingly, King's total adjusted offense level is 22.  King has not provided an acceptance of responsibility statement, nor has King exhibited acceptance of responsibility for his crime.  Therefore, the government submits that King is not entitled to a reduction for acceptance of responsibility.

B.    Title 18, United States Code, Section 3553(a) Factors

A sentence of imprisonment within the advisory guideline range of 41-51 months is appropriate and sufficient but not greater than necessary to comply with the § 3553(a) factors. Pursuant to 18 U.S.C. § 3553(a):

The court, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
>    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    (B) to afford adequate deterrence to criminal conduct;
>    (C) to protect the public from further crimes of the defendant; and
>    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence, and the sentencing range . . . ;
(5) any pertinent policy statement . . . ;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. . . .

18 U.S.C. § 3553(a).

First the nature and the circumstances of the offense warrant a sentence within the Guideline range.  The nature of this offense is particularly egregious in light of the fact that Matthew King was a practicing attorney and offered up his criminal services to someone he believed was a drug trafficker.  King did not simply advise Marcus Terry about how he could launder drug money, King created a money laundering scheme for Terry and participated in the game.  Not only did King agree to launder Terry's money, he willingly accepted $20,000, believing that it was the proceeds of cocaine sales that Terry had made that week.  Moreover, King came up with a plan that included creating shell corporations and funnel accounts that would further insulate Terry's drug money from "federal bells and whistles."  When King was preparing the corporate paperwork for Terry and it came time to list the purpose of the corporation he was forming, King said, "We can't say things like 'to launder money.'"

King knowingly and eagerly took the helm of a money laundering scheme that he believed was going to be very lucrative.  Believing that Marcus Terry was a successful drug dealer who sold kilograms of cocaine around the city, King believed that they were going to have

7

a "long and prosperous relationship."  He willingly embedded himself with this purported drug

dealer, and he took steps to assure Marcus Terry that he would be a good partner.  In addition to

creating a money laundering scheme for Terry's purported drug proceeds, King also gave Terry

advice about how to be a successful drug dealer.  King explained different ways to evade law

enforcement detection.  He offered to check on the criminal backgrounds of Terry's drug

associates to make sure that Terry could continue his drug business without the risk of one of his

associates turning on him to the police.  He advised Terry that Terry should have stash houses

where he could hide his drugs, and King even offered to find Terry police officers who could

protect Terry's drug shipments when they arrived in Cleveland.

King's offense conduct in this case occurred while he was practicing law and

representing clients, and King used his legal knowledge and his client relationships to assist

Marcus Terry's drug trafficking and money laundering efforts.  One of King's clients, Gilbert

Mendez, was under federal investigation at the time, and King represented Mendez during

Mendez's cooperation with law enforcement as part of that investigation.  Although King

knew—as part of his attorney-client relationship with Mendez—that Mendez was under

investigation, and that Mendez was making controlled drug purchases for law enforcement to

cooperate and lessen his eventual sentence, King chose to undermine Mendez's efforts and their

attorney-client relationship and warn Terry that Mendez was under investigation and that Terry

should not deal with him.

Marcus Terry was not a one-time money-maker for King.  He wanted to make sure that

Terry and other members of his purported organization could evade law enforcement and

continue their drug dealing so that Terry would keep bringing King more money.  In King's

eyes, Marcus Terry and he were going to be long-term business partners.  In each of the recorded

videos of the meetings with he and Terry, King made every effort to assure Terry that there was a plan in place to handle the large amount of drug proceeds that he was expecting from Terry. That was why, as King explained, the sham corporation and the business accounts were necessary; it was a plan that could handle a large cash flow and would provide a legitimate cover to clean the money.  Although King was never able to complete those plans, he nevertheless assured Terry that he could handle his purported cocaine proceeds before the corporation was formed by just accepting the cash and cutting small checks back to Terry.  Indeed, that is exactly what Matthew King did.

Second, King's history and characteristics warrant a sentence within the Guideline range. Matthew King was a practicing attorney for nearly twenty years.  He represented his clients in state and federal court on civil and criminal matters.  During his time as a licensed attorney, King worked as a prosecutor with the City of Lakewood, and later as an Assistant County Prosecutor with the Cuyahoga County Prosecutor's Office.  As a licensed attorney, who prosecuted criminal cases for nearly six years of legal career, King knew full well the illegality of what he was doing. However, in spite of all this legal training and in spite of the ethical obligation he took as an attorney, King decided to use his law license as a criminal tool to assist someone he believed was a drug trafficker.  King not only agreed to launder Marcus Terry's money, he also used the legal knowledge he has accumulated throughout his career during his time as a prosecutor and a defense attorney to advise Marcus Terry on how to best run his purported drug trafficking organization and launder the proceeds thereof.  As someone who had been practicing in the legal community in Cleveland, Ohio, for nearly twenty years, King had no shortage of persons in law enforcement that he could have contacted to notify them that he had identified a drug trafficker who was actively selling kilograms of cocaine.  King could have extricated himself from his

9

involvement with Marcus Terry at any point, but as the recorded meetings show, King willingly

chose to get himself in deeper with Terry and his purported drug organization.  Indeed, King was

so committed to assisting Marcus Terry that he was prepared to accept another $40,000 of

purported drug proceeds the day he was arrested.  Accordingly, because of King's choice to turn

his back on his ethical obligations and use his education and legal knowledge to further the

efforts of a purported drug trafficker, a sentence of imprisonment within the advisory Guideline

range is appropriate.

Third, a sentence within the Guideline range would reflect the seriousness of the offense,

promote respect for the law, and provide just punishment.  Indeed, respect for the law was

wholly lacking in Matthew King's offense conduct in this case.  A sentence of imprisonment

would reflect the seriousness of a licensed attorney who laundered $20,000 of what he believed

was cocaine proceeds.  Likewise, it would provide just punishment for an offense for which King

has not expressed any acceptance of responsibility.  Although King has expressed regret for

choosing to become involved with Marcus Terry, he has not accepted responsibility that what he

did was illegal.  Despite his legal training and knowledge of the law, King continues to try to

find legal loopholes for his conduct and refuses to accept responsibility for his criminal conduct.

Finally, a sentence within the Guideline range would afford adequate deterrence.  Such a

sentence would send a message that no one, especially not an attorney, is above the law.  It

would show that those who take an oath to uphold the law are equally obligated to suffer the

consequences when that person chooses to break the law.  A sentence within the advisory

Guideline range would also serve to deter King's future offense conduct.  Throughout his

criminal activity captured on the recorded video, Matthew King showed no signs of stopping his

criminal activity with Marcus Terry.  Instead, he repeated his assurances to Terry that they were

10

going to have a long relationship, and he continuously showed his willingness to further their

criminal relationship, even agreeing to accept another $40,000 of purported drug proceeds.

Matthew King chose to turn his back on the legal profession and enter the criminal world of

money laundering.  He chose this path in spite of having unique knowledge of the import and

consequences of his actions.  A sentence of imprisonment within the Guideline range would give

King a front-row seat to the reality of the consequences of his criminal choices.

## III.     CONCLUSION

For the foregoing reasons, the government requests that this Court impose a sentence of

imprisonment within the advisory guidelines range as outlined in this memorandum.

> Respectfully submitted,
>
> CAROLE S. RENDON
> United States Attorney
>
> By:     /s/ Margaret A. Sweeney
> Margaret A. Sweeney (OH: 0086591)
> Michelle M. Baeppler (OH: 0065378)
> Assistant United States Attorneys
> United States Court House
> 801 West Superior Avenue, Suite 400
> Cleveland, OH 44113
> (216) 622-3990/3995
> (216) 522-7499 (facsimile)
> Margaret.Sweeney@usdoj.gov

11

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of August a copy of the foregoing Sentencing

Memorandum was filed electronically.  Notice of this filing will be sent to all parties by

operation of the Court's electronic filing system.  All other parties will be served by regular U.S.

Mail.  Parties may access this filing through the Court's system.

/s/ Margaret A. Sweeney
Margaret A. Sweeney
Michelle M. Baeppler
Assistant U.S. Attorney